# ARTICLE X
## GRIEVANCE PROCEDURE

A. DEFINITION

The term "grievance" shall mean an allegation by any person covered by this Agreement or by the RWUFA that there has been a violation, misinterpretation, or misapplication of any of the terms of this Agreement.

B. PROCEDURE

In the event that an MBU or group of MBUs feel that they have a basis for a grievance, in accordance with the above definition, and have informally discussed the situation giving rise to the grievance with the appropriate dean or Chief Academic Officer, the following procedure shall be used:

Step 1: The grievance shall be filed, in writing, with the Chief Academic Officer, and the grievant's dean, with copy to the Office of General Counsel, by the grievant, the President of the RWUFA, or the Grievance Chair; the nature of the grievance, and which articles of the contract have been violated shall be specified in the filing. The Chief Academic Officer and the Dean will meet with the President of the RWUFA and/or the Grievance Chair in an effort to resolve the grievance. This meeting will take place within seven (7) working days after receipt of the grievance. The Chief Academic Officer and the Dean shall communicate their disposition of the grievance within seven (7) working days after the meeting to the Grievance Chair of the RWUFA. These time limits may be extended by mutual agreement of the parties. At this and each step of the procedure, any member of RWU may attend the grievance hearing.

Step 2: If the grievance is not resolved at Step 1, or if a decision has not been rendered within seven (7) working days, the grievant may file a formal grievance, in writing, within seven (7) working days after the Step 1 decision is rendered, or should have been rendered, with the Chief Executive Officer of the University. The Chief Executive Officer or his/her designee shall meet with the President of the RWUFA and/or the Grievance Chair in an effort to resolve the grievance. This meeting shall take place within ten (10) working days after receipt of the grievance unless extended by the parties. The Chief Executive Officer or his/her designee shall communicate his/her disposition of the grievance, in writing, within ten (10) working days after the meeting unless extended by the parties.

Step 3: If the RWUFA is not satisfied with the disposition of the grievance made by the Chief Executive Officer of the University, or if no disposition has been made within ten (10) working days or a longer period as agreed by the parties, and the RWUFA wishes to take the grievance to arbitration, the parties may request mediation from the Federal Mediation and

Conciliation Service within ten (10) working days of the date of the Chief Executive Officer's disposition in writing, or within ten (10) working days of the date that disposition should have been rendered, whichever is sooner. If settlement is not reached at mediation, the RWUFA may, within ten (10) working days after mediation (or, if mediation is not invoked by the parties, within ten (10) working days of the date of the Chief Executive Officer's disposition in writing, or within ten (10) working days of the date that disposition should have been rendered, whichever is sooner), submit the grievance to arbitration before an impartial arbitrator, under the rules of the American Arbitration Association (AAA), whose decision shall be binding on both parties, with a copy of the demand to the Chief Executive Officer of the University. If the parties cannot agree on an arbitrator, he/she shall be selected pursuant to the rules and procedures of the American Arbitration Association, whose rules shall likewise govern the arbitration procedure. The arbitrator shall not alter, add to or subtract from the terms of this Agreement and shall render a written decision within thirty (30) days of the close of the arbitration hearing.

C. GENERAL CONSIDERATIONS

1. Any adjustment of a grievance shall be consistent with the terms of this Agreement.

2. No reprisals of any kind shall be taken against any MBU for participating in any grievance

3. If, in the opinion of the Grievance Committee of the RWUFA, a grievance affects a group of MBUs, it may be filed on their behalf by the RWUFA.

4. Grievances must be initiated within thirty (30) days after the grievant should have been aware of the event or the action which gave rise to the grievance. Failure to file a grievance within this time shall invalidate the grievance as untimely, except in the case of a continuing grievance.

5. The grievant shall have the right to be present at all levels of the grievance procedure.

6. Neither party shall raise as bargaining history in a future arbitration any proposal made in negotiations of the successor contract to the 1995-1998, 1998-2001 and 2001-2004 contract to modify, delete or replace contractual language contained in Articles V, VII, VIII, IX and XV.

## ARTICLE XI
## RETRENCHMENT

A. Retrenchment of MBUs shall occur only as a result of (1) institutional financial emergency or (2) program curtailment.

1. Institutional financial emergency is understood to mean, in terms of this Agreement, a condition in which the University financial situation is serious due to a decline in enrollment or when total expenditures have been significantly greater than total revenues in the previous year. If such a situation arises, the administration shall meet and discuss with the RWUFA, the factors giving rise to this condition. In connection with such duty to meet and discuss, accurate information, statistics, and/or financial data related to these factors shall be made available to the RWUFA.

2. Program curtailment is understood to mean, in terms of this Agreement, (a) a decline in the enrollment within an area to the point that the average student enrollment per section falls below twelve (12). This will be computed by dividing the total number of students enrolled in sections taught within the area by the number of sections, or (b) a decision by RWU, as a result of long-range institutional planning, to phase out an academic program which is not encountering enrollment difficulties as defined in (a) above. In such cases, MBUs currently employed in the affected program shall be reduced through normal attrition or through appropriate reassignments within the bargaining unit. Temporary appointments of new MBUs may be made in the affected program during the phase-out period to maintain academic continuity.

B. INSTITUTIONAL FINANCIAL EMERGENCY

Retrenchment for financial emergency shall occur only when the conditions of A.l. above are met. The burden of proof in demonstrating the existence of institutional financial emergency shall be on the University. No MBU shall be retrenched due to financial emergency until all reassignment possibilities within the bargaining unit have been explored, investigated, and acted upon or ruled out.

C. PROGRAM CURTAILMENT

1. Each October, the Administration shall examine enrollment in each area and will determine whether the conditions described in sub-section A.2, above, exist. Average student enrollment per section will be computed by dividing the total number of students enrolled in courses within the area by the number of sections. The administration agrees to meet with the RWUFA as soon as possible after such determination and to provide them with all the data used to make such a determination.

2. If the average student enrollment per section is less than twelve (12), then the Dean of the appropriate School, the President of the RWUFA, and the Chief Academic Officer shall meet with the faculty in that area and advise them that retrenchment may occur the following semester The burden of proof in demonstrating the existence of conditions warranting retrenchment shall rest with the University.

Sections C.1. and 2. above shall apply only to Section A.2.a. of this Article.

Prior to retrenchment, all reassignment possibilities within the University shall be explored, investigated, and acted upon or ruled out. Retrenchment will occur only if no course for which the MBU is qualified to teach is available for the MBU to teach within the University. If such reassignment occurs , the average student enrollment per section shall be recomputed for the area. If the average student enrollment still falls below the level defined above, retrenchment may occur in the area until the average enrollment per section meets the level defined above.

Any MBU who is retrenched under this provision shall have his/her teaching load reduced proportionately, e.g., if his/her teaching assignment must be reduced to three (3) sections per semester, then his/her salary would be three-quarters (3/4) of scale.

3. The final decision as to where retrenchment conditions are met shall be determined by the Chief Academic Officer in accordance with C.2. above.

D. Retrenchment as the result of financial emergency or program curtailment shall be applied in the following manner.

1. Termination as a result of institutional financial emergency shall be based solely on seniority within the bargaining unit (last in-first out) in accordance with the specific procedures detailed below in D.3. and D.6.

2. Termination of MBUs as a result of program curtailment, as defined in A.2.a. above, shall be made from among those holding the same or similar positions in the program in question, in accordance with specific procedures detailed in C. above and D.3 and D.6. below.

3. Termination shall first take place as follows:

   a. Among the adjunct MBU s before full-time MBUs are terminated.

   b. Among full-time visiting MBUs, before the termination of MBUs holding probationary appointments; and among probationary appointments before the termination among tenured appointments. Such removal shall be made in the inverse order of the date of full-time appointment.

   c. Among the full-time permanent MBUs, such termination shall be based upon length of full-time service to Roger Williams University. In cases where the date of full-time appointment is the same, part-time service at Roger Williams University will be taken into consideration.

4. The Chief Academic Officer shall notify the person or persons affected in accordance with the following deadline:

   a. In the case of retrenchment due to financial emergency, at least two months prior to the end of the semester.

   b. In the case of retrenchment for program curtailment as defined in A.2.a. above, he/she will be allowed a one-month notice.

   c. In the case of program curtailment as defined in A.2.a. above, any position lost to one program shall be allocated to another program which is in need of additional faculty.

5. Persons removed as a result of retrenchment shall be advised of the opportunity for reemployment in the same or a similar position at the University for two (2) years succeeding the retrenchment year, and must accept such offer within fifteen (15) days after such offer, such acceptance to take effect not later than the beginning of the semester immediately following the date such offer was made. The University shall make every effort to place an incumbent so separated in a position for which he/she is qualified, provided such position is in the bargaining unit. MBUs who are retrenched shall be responsible for notifying the University of their current mailing address.

6. Original appointment (Date of formal letter of appointment) shall mean the date of first full-time appointment to University service as an MBU, followed by continuous and uninterrupted service within the Bargaining Unit up to the time of reduction and abolishment of positions. In the event an incumbent believes such date has been incorrectly determined, he/she shall so advise the University, and indicate the date he/she believes to be correct.

7. Any MBU who is retrenched shall be given severance pay in the amount of $2000 and shall be provided with health insurance coverage for one year from the date of retrenchment. In addition they shall have first priority for professional development funds in accordance with Article XIV.E.

## ARTICLE XII
## SEARCH COMMITTEES

At the request of the Chief Executive Officer of the University or his/her designee, faculty may serve on search committees, in accordance with Article VII, G.2. above.

## ARTICLE XIII

## COMPENSATION

### A. SALARY PROGRAM

The salary program consists of a base salary for each MBU that is directly affixed to an academic rank based, salary step matrix, indexed in each year of this Agreement, as set out in Appendix C of this Agreement and augmented as set out below:

1. <u>Conversion to Rank-Based, Longevity and Merit-Driven Salary Matrix:</u>
Each MBU's base salary will be assigned a salary step on the salary step matrix, effective July 1, 2004, as follows:
    a. Each MBU's pre-conversion salary step will be advanced one step, where available, on the former matrix and then each MBU's salary will be converted to the same or nearest higher step on the successor matrix.

    b. MBUs' salaries that are at or above the highest step on the successor matrix will receive the annual percentage increase as set out in Appendix C and will be assigned the highest step value on the successor matrix for purpose of participation in the rank based, longevity and merit-driven salary program.

2. <u>Annual Step Adjustment:</u>
Commencing July 1, 2005 and each successive July 1st thereafter, those MBU's with at least one full academic year of full-time employment as an MBU and whose salary step placement is more than one step below the merit only step division of the matrix, will move one full salary step on the matrix. This move will determine the appropriate, indexed step on the matrix and will precede any other salary adjustments.
    a. An MBU on unpaid leave from active University employment for at least one full semester plus thirty-five consecutive days during any year of this salary program, will not receive an annual, longevity based increment.

3. <u>Merit Compensation Program:</u>
    a. <u>Funding:</u>

        (1) Commencing July 1, 2004, a merit compensation program will be funded at 1.00% of the composite base salary as of June 30, 2004 of all probationary and tenured MBUs (pooling MBUs) with at least one full year of employment as an MBU as of June 30, 2004. This fund will be pooled and held in escrow until distribution is authorized in accordance with merit program parameters set out below.

        (2) Commencing July 1, 2005, the merit compensation program will be funded at 1.25% of the composite base salary as of June 30, 2005, of all pooling MBUs with at least one full year of employment as an MBU as of June 30, 2005.

(3) Commencing July 1, 2006, the merit compensation program will be funded at 1.25% of the composite base salary as of June 30, 2006, of all pooling MBUs with at least one full year of employment as an MBU as of June 30, 2006.

(4) Commencing July 1, 2007, the merit compensation program will be funded at 1.25% of the composite base salary, as of June 30, 2007, of all pooling MBUs with at least one full year of employment as an MBU as of June 30, 2007.

(5) All funds not awarded in any given year of the Agreement will be indexed upward by the same percentage applicable to the salary matrix for full Professors in the succeeding year and will be repooled for distribution in the succeeding year.

(6) At least 50% of all funds distributed in non-base merit awards, in any given year, will be repooled for distribution in the following performance year.

a) Example: *Year 1*

Merit Pool = $125,000<br>
Awarding = $ 50,000 to base<br>
$ 50,000 non-base<br>
$ 25,000 not awarded

*Year 2*

Merit Pool = $160,000 + $25,000 x 3.5% or $25,875 + $25,000 (50% of prior yr. non-base award)

Total = $210,875

(7) Subject to the 50% redistribution rule immediately above, all funds will be awarded at the conclusion of the 2007/08 performance pay cycle.

a) Example: *Year 4*

Merit Pool = $185,000 + $20,000 (50% of prior yr. non-base awards) or $205,000 total<br>
Awarding = $ 125,000 to base<br>
$ 80,000 non-base<br>
> Fully spent

Can't carry "unawarded" $ spent beyond term of Agreement into out year but $40,000 (50%) in nonbase won't be awarded in 07/08 performance pay cycle but will be awarded in 08/09 cycle.

b. Merit Program Application:

(1) Merit Awards will be in step or step equivalent increments only except and only as necessary to bring an unscheduled salary to the next higher step on the matrix.

(2) Awards may either be to base salary or in non-base increments. Awards for MBUs whose base salary is at or above the salary cap for the applicable academic rank may be in step equivalent base or non-base increments applicable to the rank of the MBU.

(3) Awards are available for all selected probationary and tenured MBUs with at least one full year of prior full-time service to the university as an MBU, as of the beginning of each year of award application.

(4) Merit Awards are available for application to any step on the matrix for all ranks.

(5) There is no step or step equivalent limitation on any award.

(6) Merit Awards to base salary will be applied after both available longevity increments and annual salary indexing as set out in Appendix C.

(7) College/School Program:

Seventy-five (75%) of the merit pool will be distributed directly to each School/Division of FCAS of the University for awarding based on the percentage of full-time, pooling MBU's in each School/College in relation to the available funds. For example, if School "X" has 15% of the pooling faculty, it will receive 15% of the available funds. If a School/Division of FCAS has three (3) faculty, newly hired following pool calculation for the coming year, those faculty will not count in the fund distribution formula.

Awarding will be as follows:

a) All base salary awards will be effective in the first pay period of the new fiscal year as applicable to both academic year appointments and fiscal year appointments, respectively.

b) The Dean, in consultation with a specially constituted Merit Review Committee, will determine awards in "Step Value Increments" as set out in Appendix C, based upon the overall record of performance through the past year, with particular focus on the past year and how it has and will enhance the advancement of the academic/professional discipline, the school or college and/or the University.

c) The evaluative criteria are teaching excellence, scholarship in or related to the discipline for which the faculty member is employed, applied or bench research of significance and/or distinguished professional service.

d) Base salary awards are reserved for prolonged contributions in performance and highly significant achievements in academia.

e) The Merit Review Committee for each School/Division of FCAS will consist of the dean (or formal designee) as Ex-Officio Chair, two tenured professors or chairpersons selected by the Chief Academic Officer, and a tenured professor or chairperson elected by the faculty of the School/Division of FCAS to serve one year, renewable terms. *(For Librarians & Counselors, there will be a joint Merit Review Committee, composed as above except: (i.) the Committee must have at least one Counselor and (ii.) the Dean's role will be filled jointly by the Dean of University Library Services and the Vice President of Student Affairs or his/her designee.)* The Chief Academic Officer, at his/her discretion, may form joint Merit Review Committees by combining the faculties of those faculty units with less than twenty (20) full-time faculty members. In the case of combining faculty units, the reconstituted unit will receive one 75% ratable apportionment as set out above.

i.) Each "Committee Member" must recuse himself/herself from both deliberations and recommendations concerning their own performance or that of their spouses as it relates to merit awarding.

ii.) The Committee "shall" rank order the eligible MBU's with written rationale for the ranking, attached to the ranking. Thereafter, the Committee shall meet with the dean, discuss the relative rankings and "may" recommend an awarding of steps or step equivalents from available funds.

iii.) The dean shall consider the consultative recommendations and rankings, as well as the relative, comparative performances of the eligible Merit Review Committee members and shall apply that ratably apportioned pool of merit funds to those MBU's deemed most deserving, specifically and limited to applying that criteria set out herein for merit award consideration. The dean shall deliver to the Chief Academic Officer, a written report identifying the specific rationale for the awarding and "may" make recommendations for awarding of the

unassigned 25% of ratable apportioning of pool funds.

iv.) To be eligible for consideration by the applicable Merit Review Committee, MBU's must follow the report guidelines and deadlines set out in Appendix F or receive approval from the Chief Academic Officer to submit a report in an alternative format.

(8) Executive Program:
The Chief Academic Officer, in consultation with the President and following full consideration of the record provided, will supplement the awarding of merit from those funds not apportioned to the Schools/Divisions of FCAS. The funds available need not be applied to the College/Division of FCAS from where the apportionment originated.

a) The same criteria used for evaluation, ranking and awarding at the School/Division of FCAS level apply to the Executive Program.

b) Written rationale will accompany the awarding of merit and will be made available to the RWUFA upon request.

c. Merit Appeal Procedure:
While the evaluative criteria utilized to make competitive selections and awards necessarily involves both subjectivity in comparative analysis and objectivity in identifying achievement(s), it is fully understood that reasonable people may disagree about the level and breadth of contributions, accomplishments and the prediction for new and continuing success(es). This disagreement does not serve as a basis for overturning an award or a lack of awarding to any MBU. Nevertheless, an exclusive, limited appeal of the awarding process, as it applies to an individual, is available as follows:

(1) Eligible Appeal: An appeal may be brought for either of (and only under) the following circumstances:

a) There is an awarding by RWU inconsistent with the rank ordering of the Committee such that an MBU ranked lower than the appellant is awarded merit and the appellant is not; or

b) The appellant has been denied merit for two consecutive years. In this case, the appellant may only appeal the third denial. A successful appeal by the appellant will shorten the successive period of eligibility for appeal following future merit denial to one successive year.

(2) The appeal must be filed within thirty (30) days of notification to the appellant of both the School/Division of FCAS rank ordering and the

complete roster of merit recipients, accompanied by those steps awarded to said recipients.

(3) The appeal must be filed, in writing, and addressed to the Appeals Committee Chair with copy to both the University's Vice President of Human Resources and the University's Chief Academic Officer.

a) The appeal must state, with specific detail, the substantive and procedural basis for appeal and identify that evidence, including testimonials, that will be presented in support of the appeal and the requested satisfaction of the appeal.

(4) The standard of review for all appeals is "rational basis." The MBU shall be entitled to receive, from the Chief Academic Officer, the rationale for the denial of merit. Therefore, the appellant must demonstrate, through argument and/or evidence that the awarding/non-awarding rendered was arbitrary and capricious as it specifically applies to him/her. This may involve direct comparison of awarded colleagues' contributions. The Appeals Committee will be allowed significant latitude to properly test the arbitrary and capricious argument, including both questioning appellant, the dean and/or Chief Academic Officer and reviewing named merit recipient's records as compared to that of the appellant.

(5) If the Appeals Committee finds, preliminarily, that a claim and associated evidence of "no rational basis" has been provided by appellant, it must afford RWU an opportunity to rebut the colorable claim with both argument and evidence.

(6) A successful appeal will result in decreasing the next year's pool by the amount of the award plus the cost of compounding the earlier award if the award is in base salary.

(7) The Appeals Committee will render a decision on a properly filed appeal within sixty (60) days of its filing unless the proper presentation of the case and available rebuttal makes the deadline impracticable, in which case the decision may be delayed for a reasonable period not to exceed an additional thirty (30) days.

(8) The Appeals Committee may hear multiple appeals at the same time.

(9) The Appeals Committee will annually be reconstituted and will be composed of two deans selected by RWU and one faculty member selected by the Faculty Senate or the Chief Academic Officer if the Senate fails to appoint one who is willing and able to serve.

a) The Dean of the College/School housing the appealing MBU may not serve on the Merit Appeals Committee.

(10) All decisions on appeal are final and binding and may not be grieved.

(11) Any violation of the merit program procedure only may be grieved by the RWUFA.

4. Promotion:

While promotion through the university's academic rank structure is not a condition of continuing employment, it is the natural and expected recognition of continuing professional growth and improvement toward academic leadership to the chosen discipline, the Department/School/College and the University. Accordingly, the achievement necessary for promotion will be significant and the monetary recognition significant. Commencing with the 2004-2005 academic year, salary compensation attendant to promotion will be as follows:

a. Upon promotion from either Assistant Professor to Associate Professor or Associate Professor to Professor, salary step placement will be effected such that the step occupied prior to promotion will be advanced by at least five thousand dollars ($5,000) through placement of the promoted MBU on the same or nearest higher step on the new salary range after the $5,000 increase.

b. For those MBU's whose base salary is at or above the highest step of the salary range for the rank, promotion will be effected such that their base salary will be advanced by $5,000 in 2004/05, by $5,200 in 2005/06, $5,400 in 2006/07, and $5,600 in 2007/08.

5. Notwithstanding the above, RWU may hire and provide initial compensation for MBUs in market driven, highly compensated disciplines and/or with exceptional talent, background and/or accomplishments, from outside the University, independent of the negotiated salary matrix.

6. Except as set forth herein, salaries for full-time teaching faculty and full-time non-teaching faculty shall be paid over twenty-six (26) bi-weekly pay periods for services rendered during the term of this contract. However, newly hired MBUs will be paid over twenty-two (22) bi-weekly pay periods in their first year, commencing with the first pay period after the start of the academic year.

7. Retroactivity – RWU will make an adjustment in a paycheck issued following the execution of this Agreement to ensure that the new salary matrices program and the guaranteed percentage increases for those above the highest step of the applicable matrix only are made retroactive to include the pay periods ending on or after July 23, 2004 up until the execution of the Agreement.

B. ADDITIONAL COMPENSATION

1. MBUs teaching assigned overloads, and all Adjunct MBUs assigned, on a per contact hour basis, to teach at the University will be compensated as follows (three- credit classroom course in the day program in parenthesis).:

| | 2004-2005 | 2005-2006 | 2006-2007 | 2007-2008 |
|---|---|---|---|---|
| Undergraduate Courses: | $1,120 ($3,360) | $1,176 ($3,525) | $1,234 ($3,702) | $1,296 ($3,887) |
| Graduate Courses: | $1,575 ($4,725) | $1,654 ($4,962) | $1,737 ($5,211) | $1,824 ($5,472) |

Adjunct teaching MBUs teaching at least six (6) or more contact hours in the daytime program shall be compensated at the above rates for any and all evening and/or summer courses taught.

2. Adjunct teaching MBUs shall be paid a prorated portion of their total compensation each pay period, normally beginning not later than the second pay period after the start of each semester or term.

3. The following payment system shall apply to adjunct MBUs teaching ESL courses:

   a. ESL courses will be scheduled and taught in six (6) contact hour blocks. The rates, per contact hours, are as follows, during the term of this Agreement:

      i. Academic Year 04/05: $630 per contact hour ($3,780 per block).
      ii. Academic Year 05/06: $662 per contact hour ($3,972 per block).
      iii. Academic Year 06/07: $695 per contact hour ($4,170 per block).
      iv. Academic Year 07/08: $730 per contact hour ($4,380 per block).

   Notwithstanding anything to the contrary elsewhere in this Agreement, due to the fact that ESL enrollment varies from semester to semester, additional pro-rated compensation will be paid if the number of students in a course exceeds ten (10) (e.g., 1/10 of $3,780 in 04/05 for an 11th student).

4. ADJUNCT FACULTY IN ARCHITECTURE

Adjunct faculty MBUs teaching in the School of Architecture, Art and Historic Preservation shall be compensated for architecture design studio courses at the rate of:

   a. $13,250 per nine (9) hour studio in Academic Year 04/05.
   b. $13,710 per nine (9) hour studio in Academic Year 05/06.
   c. $14,195 per nine (9) hour studio in Academic Year 06/07.
   d. $14,692 per nine (9) hour studio in Academic Year 07/08.

5. SPECIAL PROJECTS, THESIS SUPERVISION & COMPREHENSIVE EXAMS

Independent Studies may be handled through appropriate professional workload balancing, consistent with the terms of this Agreement and normative professional practices. Absent calculation in workload balancing, the independent study rate for all special projects, thesis supervision and comprehensive exams shall be set at $94 per credit for undergraduate projects and $126 per credit for graduate projects.

6. INDIVIDUAL STUDENT INSTRUCTION IN THE SCHOOL OF CONTINUING STUDIES

Any full-time faculty member who, in addition to his/her full-time teaching load, serves as instructor/supervisor of a directed seminar/reading project, independent study project, internship project, online course or other credit-bearing learning activity for the School of Continuing Studies may assume up to three (3) separate preparations or projects per semester with a maximum combined enrollment of twenty-eight (28) students with the consent of their school dean. Upon completion of each project at the conclusion of each semester, the MBU shall be paid $94 per credit ($282 per three credit special project) for enrollments of up to eleven (11) students in each course. The standard overload rate applies for individual sections with enrollments of twelve (12) to twenty (20) students. This rate will be increased yearly at the same rate as the overload rate.

7. LIBRARIANS AND COUNSELORS

Librarians and Counselors working under twelve (12) month contracts shall receive an additional one-sixth (1/6) of their base-salary.

## ARTICLE XIV
## FRINGE BENEFITS

A. INSURANCE

RWU agrees to provide each full-time MBU and his/her family with the following:

1. Health Insurance – RWU will provide for full time-MBUs either individual or family plan coverage under the prevailing health insurance plan (Blue Cross-Blue Shield Healthmate Coast to Coast) underwritten by the University's health insurance carrier. MBUs will contribute by payroll deduction five (5%) percent of the health insurance premium up to a contract year maximum as provided in Article XIV.A.4. MBUs presently enrolled in Blue/Cross Blue Shield Classic may continue provided that they contribute five (5%) of the cost to the University of the individual or family BC/BS Classic premium up to the contract year maximum.

2. Dental Insurance – RWU agrees to provide, at the RWU's expense, each full-time MBU and his/her family with fully paid Delta Dental, Level IV, individual or family plan, and student rider to age 24.

3. RWU and the RWUFA agree that RWU may investigate alternative carriers for health and dental insurance, but that any changes in carriers will be effective only through mutual agreement of the parties.

4. Contract Year Maximum Health Contribution – The obligation of full-time MBUs to contribute to the payment of health insurance premiums shall not exceed six hundred ($600) dollars in contract year #1 (04/05), seven hundred ($700) dollars in contract year #2 (05/06), nine hundred ($900) dollars in contract year #3 (06/07), and nine hundred ($900) dollars in contract year #4 (07/08) in the case of family coverage or three hundred ($300) dollars in contract year #1 (04/05), three hundred fifty ($350) dollars in contract year #2 (05/06), four hundred fifty ($450) dollars in contract year #3 (06/07), and four hundred fifty ($450) dollars in contract year #4 (07/08) in the case of individual coverage.

5. Buy Back – If a full-time MBU chooses, he/she may opt to receive 50% of RWU's share of the health insurance and/or dental insurance or the annual cost of individual coverage, whichever is less, in lieu of the insurance coverage.

6. Life Insurance - RWU agrees to provide MBUs with $50,000 life insurance. MBUs shall have the option of purchasing up to $25,000 more in life insurance at his/her expense at the group rate, if and to the extent the insurance carrier permits it. No medical examination or waiting period is required. There shall be a double indemnity provision for accidental death or dismemberment. All policies continue in force without further premium payments if the MBU becomes totally disabled before age sixty (60).

7. Short-Term Disability Insurance – RWU will continue to provide, at the RWU's expense, each full-time MBU with short term disability insurance coverage which supplements Rhode Island Temporary Disability Insurance. The policy provides for no medical examination or "waiting" period and payment under the policy begins when an illness or injury extends beyond the full-pay sick leave benefit period. The policy provides that those employees who qualify under the policy receive benefits which supplement RI TDI so that the total temporary disability payments including Rhode Island Temporary Disability benefits amount to 60% of an employee's normal base pay up to a maximum of $3000 per month for a period of twenty-six (26) weeks. While Temporary Disability coverage is in force, the RWU reserves the right to require a periodic statement from the MBUs physician.

8. Long Term Disability Insurance - RWU will provide, at the RWU's expense, coverage for MBUs under its present total disability insurance policy which supplements Social Security Disability Benefits . No medical examination is required. Those employees who qualify under the policy receive benefits which supplement Social Security Disability Benefits so that the total disability payments, including Social Security Disability Benefits amount to 60% of an employee's normal base pay, up to age sixty-five (65). If an employee who is enrolled in the TIAA/CREF, VALIC, or other Retirement Plan becomes totally disabled, total

including Social Security Disability Benefits amount to 60% of an employee's normal base pay, up to age sixty-five (65). If an employee who is enrolled in the TIAA/CREF, VALIC, or other Retirement Plan becomes totally disabled, total disability insurance also covers his/her retirement premiums during the period of total disability.

9. RWU may substitute similar life insurance or disability insurance plans for those plans currently in effect.

10. RWU will make available for MBUs, on a voluntary basis, a Section 125 Plan for unreimbursed medical expenses (including dental and vision expenses), and dependent day care reimbursement. RWU agrees to allow MBUs to participate in Child Care and unreimbursed medical options up to the maximum set by the IRS. The plan will be administered by RWU or its designee in accordance with the Internal Revenue Code and its implementing regulations provided that the RWUFA will be informed of specifics and major changes before implementation.

B. SOCIAL SECURITY – All MBUs are covered by the mandatory Federal Social Security Program, which provides both retirement and disability benefits and, at age 65, medical/hospital benefits under Medicare.

RWU matches the MBUs required contributions, which are made via payroll deductions on a calendar-year basis.

C. WORKERS' COMPENSATION – All MBUs are protected under Workers' Compensation in case of on-the-job accidents. All such accidents, however minor, should be reported promptly to the University Nurse and the Dean of the appropriate School or supervisor, who will in turn fill out an official report form and forward it to the Department of Human Resources.

D. VACATION WITH PAY – Non-teaching MBUs are eligible for four (4) weeks (twenty (20) work days) after one year of continuous service. The vacation cycle is based on the University fiscal year, which starts July 1 and ends June 30. Paid vacation time for less than a full first year of continuous service is granted on a pro-rated basis, starting after three (3) months of such service.

E. PROFESSIONAL TRAVEL AND DEVELOPMENT

1. RWU agrees to encourage continued professional development by budgeting annually, per full-time MBU (as of September 15 of each year) the amount set out below for professional development.

| | |
|---|---|
| 2004-2005 | $1,500 |
| 2005-2006 | $1,650 |
| 2006-2007 | $1,950 |
| 2007-2008 | $2,000 |

2. Part-time non-teaching MBUs may also participate in this program on a pro-rated basis. Part-time faculty MBUs who are paid a percentage of a full salary shall be eligible for professional development funds on a pro-rated basis.

3. Policy & Procedure Governing Professional Travel & Development
The policy and procedure governing the application disbursement, record keeping and audit of this program is found in a fully executed Policy Agreement between RWU and the RWUFA, effective July 1, 2006 and incorporated herein by reference.

4. With the advent of the above referenced Policy and Procedure, the special committee (Committee V), charged by the parties hereto, with studying, analyzing, developing and recommending a prudent course of action, is successfully dissolved, having accomplished their goal.

5. Foundation to Promote Scholarship and Teaching

a. The purpose of the Foundation is to encourage and support the efforts of MBUs in the wide variety of different kinds of scholarly activities generally recognized in undergraduate-focused universities and articulated in Scholarship Reconsidered and the subsequent expansion of Ernest Boyer's work supported by the Carnegie Foundation for the Advancement of Teaching. RWU notes that Boyer articulated the importance of the Scholarship of Teaching in promoting excellence in the classroom as a key concern in the context of the University's mission.

The general criteria used by the Foundation in providing different kinds of support for scholarship shall include academic merit/validity, the nature

to the University's mission. The Foundation shall review grant and course release requests submitted to it and shall determine whether and to what extent such grant or course release requests shall be funded or approved. (Scholarly research as applied to those faculty members in the area of Fine and Performing Arts shall encompass creative activity in their respective discipline, providing that this activity contributes to the artistic and/or intellectual substance of the profession.)

b. The Foundation shall consist of six (6) members: four full-time faculty members elected at-large from the faculty (two (2) from the College of Arts and Sciences and two (2) from the professional schools of the University); the Chief Academic Officer (or his/her designee), who shall serve as its voting chair and; a School/College dean appointed by the Chief Academic Officer who will also serve as a voting member. To be eligible for election to the Foundation faculty members must have a record of scholarship evidenced by publication, the award of external grant support or presentations at professional conferences within the last three years.

c. The Foundation shall establish fair, appropriate, and efficient procedures for soliciting grant or course release requests, and for reviewing such requests and determining whether and to what extent specific requests are to be funded or approved. The Foundation shall not be obligated to make any grants or approve any course releases if no appropriate proposals are received and positively evaluated. MBUs receiving grants shall submit a detailed report of their activities to the Foundation within thirty days of the start of the semester following their award. Members of the Foundation may not participate in the review of any proposals that they submit to the Foundation. The decisions of the Foundation shall be final and binding. The applications to and awards made by the Foundation shall be a matter of public record and will be communicated to the University community in a timely fashion.

d. The Foundation shall award both grant funds and course releases to support scholarly activities. However, as noted below, a portion of these resources are to be set aside to support proposals focused on the Scholarship of Teaching to promote the enhancement/exploration of such areas as teaching methods, responses to different learning styles, integration of technology in teaching, the assessment of student learning outcomes and other pedagogically-oriented kinds of scholarly endeavor.

e. To fund monetary grants RWU shall make available, to the Foundation, the following monies:

| Year | General Scholarship | Scholarship of Teaching | Total |
|---|---|---|---|
| 2004-2005 | $43,202 | $7,000 | $50,020 |

| | | | |
|---|---|---|---|
| 2005-2006 | $47,025 | $14,000 | $61,025 |
| 2006-2007 | $53,500 | $21,000 | $74,500 |
| 2007-2008 | $61,340 | $28,000 | $89,340 |

f. For course releases per semester (year total) the University shall make available to the Foundation the following:

| Year | General Scholarship | Scholarship of Teaching | Total |
|---|---|---|---|
| 2004-2005 | 6(12) | 3(6) | 9(18) |
| 2005-2006 | 6(12) | 3(6) | 9(18) |
| 2006-2007 | 7(14) | 4(8) | 11(22) |
| 2007-2008 | 7(14) | 4(8) | 11(22) |

i) Seventy-five hours of release from regular reporting and associated counseling or librarian responsibilities shall constitute one course release for either counseling or library science faculty.

g. All proposals for grants or course releases shall clearly articulate how the results of the proposed scholarship will be effectively presented to, and critiqued by, appropriate external reviewers. It is expected that all funded proposals will have one or more outcomes that will result in external presentation and critique. Traditional forms of presentation and critique include treatises, books, monographs, refereed articles, reviews, or critiques in journals, periodicals or other appropriate publications. The University also recognizes other forms of presentation and critique such as presentations at professional meetings, professional workshops, external requests for consultation, reviewed creative performances, commissions for professional work and curricula proposals reviewed by appropriate external consultants.

Any MBU who receives grant or course release support and who fails to produce the general required outcome of external presentation and critique will not be eligible for further Foundation support without the consent of the Chief Academic Officer. No recipient of a course release may teach a course overload during the release semester (permission may be granted in exceptional cases by the School/College dean). A course release not used in the semester first authorized shall be carried over to the next semester only.

6. Core Curriculum Committee Course Releases

a. The University community recognizes the critical importance of the Core Curriculum experience for all undergraduate students. It is, therefore, appropriate that release time be available for faculty projects that will enhance teaching within the Core Curriculum and enhance the assessment of student learning outcomes resulting from Core courses or from the

overall Core program.

b. Each year the Core Curriculum Committee will solicit requests for course releases for Core Curriculum related projects. The Committee may recommend three (3) such projects a semester (yearly total of six) to the Dean of the College of Arts and Sciences. The dean will normally select two (2) proposals for Core-related releases per semester in the subsequent academic year. The dean is not required to approve a course release request that she/he believes is not sufficiently documented or deserving.

c. Core Curriculum course releases must meet the standards for presentation and critique that apply to course releases granted by the Foundation to Promote Scholarship and Teaching. With the permission of the Dean of the College of Arts and Sciences, selected projects may be presented to and critiqued by the Core Curriculum Committee.

7. Provost's Teaching Colloquium

a. Since excellence in teaching is a primary factor in the evaluation of all faculty members, the University is committed to providing all faculty members regular exposure to scholarly developments in pedagogy and the opportunity to hear from and participate in national associations that focus on undergraduate education, such as the Carnegie Foundation for the Advancement of Teaching and the Associated New American Colleges. To further this aim the University is establishing the *Provost's Teaching Colloquium.*

b. The Colloquium will receive a budget of $7,000 per year which will be expended with the guidance of a faculty steering committee. Funds will be used for such items as:

- faculty seminars-meeting series
- external consultants/speakers
- site visits
- conferences

8. Nothing in this section shall preclude a dean from granting additional course releases with the approval of the Chief Academic Officer.

F. RETIREMENT PLANS

1. All full-time MBUs shall have the right to join and make deposits in TIAA/CREF, VALIC, or other Retirement Plan or any additional retirement funding vehicle made available by RWU. RWU agrees to contribute ten percent (10%) of the MBUs base salary and the MBU must contribute five percent (5%) of his/her base salary. MBUs hired on or after January 1, 1996 are eligible to receive the RWU's ten percent (10%) matching contribution after the completion of one year service. However, newly hired

faculty who are already enrolled in either a TIAA/CREF or VALIC plan prior to being hired by RWU may immediately enroll in the RWU's retirement plan and will be entitled to the ten percent (10%) matching contribution as delineated above. A year of service is defined as a twelve month period during which the MBU works a minimum of 1,000 hours. The MBU is fully and immediately one hundred percent (100%) vested in RWU's contribution. Employees shall have the right to make their own contributions immediately upon the date of hire. All rights, including contributions made by RWU, shall be one hundred percent (100%) vested with the MBU.

2. RWU agrees to participate in the TIAA/CREF or VALIC Supplemental Retirement Annuity Program, at the MBUs' option and to allow MBUs to contribute to this plan through payroll deductions. It is understood that RWU will not contribute financially to this supplemental program.

G. DISCOUNTS AND PRIVILEGES

1. MBUs will be admitted to all RWU-sponsored events free of charge.

2. MBUs may cash personal checks of up to $100 in the Bursar's Office.

3. MBUs shall have the right to direct the deposit of all or any portion of their paycheck into any financial institution insured by the Federal Deposit Insurance Corporation, consistent with RWU's payroll capacity and provided that any direction of a change in excess of one (1) during one academic year shall cost $5.00 per change.

4. Normally, all MBUs will be provided with a permanent identity card by October 1.

H. PERSONAL LEAVES OF ABSENCE

Authorized leave of absence from the University at full salary, or without salary, generally shall not be deemed an interruption of service within the Bargaining Unit. The following categories of leave are available under the terms and conditions set forth:

1. Death In the Immediate Family of an MBU

A maximum of five (5) days with full pay upon death of husband or wife, father or mother, son or daughter, father-in-law or mother-in-law, son-in-law or daughter-in-law, brother or sister, or grandchild. A maximum of three (3) days with full pay upon the death of brother-in law or sister-in-law, grandparent, or a relative living in the same household. RWU may require proof of death.

2. Illness of MBU

Fifteen (15) work days per year with full pay in any fiscal year (July 1 to June

30). Sick leave is cumulative to forty-five (45) days, calculated from the date of initial appointment of MBU.

3. Jury Duty

Upon presentation of jury summons, MBU will receive the difference between his/her university pay and jury pay for each day of required jury duty. He/she is, however, expected to report for work on any day when he/she is excused from jury duty for at least half a day.

4. Parental Leave

Parental leave will be granted, without pay, up to one (1) year during the term of this Agreement. Health insurance will continue through the leave period The MBU shall suffer no loss of employment security or benefits by virtue of taking an authorized leave hereunder. The MBU on parental leave shall notify RWU of his/her intention to return to work at least four months prior to the start of the next semester. The year shall not count towards the accrual of years toward a sabbatical. The parties agree to abide by the provisions of both the federal and state Family and Medical Leave Acts and the 1978 Pregnancy Discrimination Act (P.L. 95-555), as amended, in administering this provision.

At the Chief Academic Officer's discretion and at the request of the MBU, an additional one full semester unpaid parental leave or a reduced work load and salary may be granted in accordance with those terms set by RWU. An MBU electing a reduced work load and salary under this provision may, at the discretion of the Chief Academic Officer, elect to have this semester count toward tenure.

5. Military Leave

Upon presentation of duty dates, military orders and military pay rate, all MBUs will receive up to thirty (30) days of reserve leave in addition to his/her regular pay and military pay for this leave and continue all fringe benefits.

Upon official discharge from military leave, an MBU may elect to resume appropriate duties at RWU and full salary within thirty (30) days of the completion of leave.

All fringe benefits will continue during military leave, except as identified above, or as provided by the military.

6. Sabbatical and Other Professional Leaves

a. Sabbatical Leave

After each seven (7) consecutive years of full-time service, excluding leaves greater than one semester in duration, with Roger Williams University, sabbatical

leave may be granted. After the completion of the academic year in which a sabbatical has been taken, the seven (7) consecutive years of service requirement begins anew. All sabbaticals shall be subject to the following considerations:

1) The MBU shall pursue a program of professional development calculated to enhance his/her ability to serve the University. In no event shall an MBU on sabbatical hold a full-time job without the approval of the Chief Academic Officer.

2) MBUs planning to take a sabbatical shall prepare a statement describing in detail the purpose and nature of the professional activities in which they will be engaging, including an explanation of how the proposed activity will be of benefit to the individual professionally and to the institution. Sabbatical proposals shall satisfy one of the following criteria for approval:

    a) Sabbatical would demonstrably and substantively improve his/her teaching skills and/or curriculum;

    b) Sabbatical would be used to produce an article, book, artistic creation, or material within the faculty members discipline for purposes of publication, performance or exhibition; or

    c) Sabbatical would be used for advanced study such as degree programs, course work, seminars, workshops, fellowships, supervised independent study or supervised research.

3) Intention to apply for a sabbatical must be communicated in writing to the Chief Academic Officer by May 1; sixteen (16) months before the beginning of the sabbatical year. A list of applicants with their dates of initial appointment and the dates of their last sabbatical, where applicable, will be disseminated by the Chief Academic Officer within ten (10) work days.

4) Sabbatical leaves will be limited to a maximum of eight percent (8%) of the full-time probationary and tenured MBUs in any given academic year. If more faculty members are eligible and apply than meet the criteria set forth herein than the agreement allows, the faculty shall be selected on the basis of one or more of the following criteria:

a) opportunities for all individuals in all fields to have sabbaticals, provided that no eligible MBU shall consistently be denied a sabbatical for this reason;

b) a singular sabbatical opportunity involving recognition for an individual and/or the University;

c) the adverse effect of a leave upon the academic program of the individual and the department, provided that faculty members denied for this reason will have their leave postponed until the following year, if applicable;

d) length of full-time employment with the University or the date of termination of the MBUs last sabbatical, whichever is more recent, provided that employment outside the bargaining unit or employment prior to leaving the bargaining unit shall not apply for this purpose to administrators who become MBUs. RWU may, within its discretion, give leaves to former administrators beyond the 8% of MBUs.

The award of sabbatical shall be made on or about November 1.

5) The statement of proposed sabbatical activity shall be submitted to a Faculty Sabbatical Committee composed of one (1) representative elected annually from each school and/or unit. Faculty members elected to the Faculty Sabbatical Committee will have taken a sabbatical within the last five (5) years.

MBUs planning to take sabbatical leave shall submit their proposals to the Faculty Sabbatical Committee, with a copy forwarded by the faculty member to the Chief Academic Officer and the dean of the appropriate school or college, not later than September 15 of the year preceding the sabbatical year. The Faculty Sabbatical Committee shall review all sabbatical leave proposals as well as any input forwarded by the deans of the applicants' Schools/Colleges, in terms of all of the criteria set forth in this Article and forward the proposals in priority order with recommendations to the Chief Academic Officer not later than October 15th preceding the sabbatical year.

After considering the Committee's recommendation, the Chief Academic Officer shall determine whether the MBU meets the criteria to receive sabbatical leave.

This provision (ARTICLE XIV H.6.a.) may be reopened for negotiation,

during the term of this Agreement, by the RWUFA, upon thirty (30) days written notice to RWU, if and only if the number of sabbatical leave requests that meet all the criteria set forth herein, in any given year, as determined by written findings of at least two thirds (2/3) of the Faculty Sabbatical Committee, exceed the maximum number of leaves granted hereunder by more than twenty-five percent (25%). For example, if the maximum number of sabbaticals that may be granted in a given year is fourteen, and the number of sabbatical requests meeting all the criteria set forth herein, is nineteen (19) or more, the negotiations on this entire provision shall be reopened.

6) Sabbaticals may be taken for either a semester or an academic year (pro-rated in the case of non-teaching faculty). Compensation will be at the rate of one hundred percent (100%) of the MBUs salary for one (1) semester leave and fifty-five percent (55%) of the faculty member's salary for an academic year leave.

7) An MBU granted sabbatical leave shall sign a statement that he/she shall return to full-time teaching at Roger Williams University at the end of the sabbatical period for at least two (2) years. In the event that there is a violation of such agreement, the MBU shall forfeit to RWU all monies paid to him/her by the University during the sabbatical period.

8) An MBU must substantively demonstrate, to the Chief Academic Officer, achievement of the proposed outcomes of the sabbatical leave through a detailed report and/or other acceptable documentation within thirty (30) days of the start of the following semester. Transcripts of any advanced study must be sent, when course work is completed, to the Chief Academic Officer.

9) All fringe benefits shall continue to be paid while the MBU is on sabbatical leave.

b. Academic Leave of Absence

1) An academic leave of absence without pay may be requested by an MBU, normally after two (2) years of full-time service to the University. Leave of absence requests may be made sooner if the person requesting the leave is in receipt of an educational grant or fellowship in his/her academic field, and if that grant or fellowship is provided by sources outside the University.

2) Determination on leaves of absence shall be made through mutual consent of the Chief Academic Officer and the Dean of the appropriate School

3) Blue Cross--Major Medical shall continue to be paid by RWU while the MBU is on leave.

7. Leave to Serve in University Administration

Leaves of absence granted to MBUs by RWU to allow service in an administrative capacity at the University shall not interrupt an MBUs continuity of appointment in the Bargaining Unit (for purposes of seniority, etc.) so long as leaves do not exceed four (4) semesters within a four (4) year period. If an individual does not return to the Bargaining Unit within four (4) semesters or serves in an administrative capacity for more than four (4) semesters within a four (4) year period, they shall be considered to have interrupted their continuous service in the Bargaining Unit, terminating seniority, and shall be treated, in case that they are later appointed to a position within the Bargaining Unit, as any new MBU in terms of seniority as defined in this Agreement. All former MBUs who are currently serving in an administrative capacity will be entitled to return to the Bargaining Unit with full seniority provided that they do not service in this capacity for more than four (4) semesters in a four (4) year period commencing in September of 1995.

No member of the Bargaining Unit paid on the basis of the salary scales in Appendix C shall suffer a loss or reduction in employment as a result of the administrator returning to the Bargaining Unit.

## I. RELEASED TIME

Released time may be arranged with permission of the Dean of the appropriate School and the Chief Academic Officer. Compensation and fringe benefits will be pro-rated upon the portion of the faculty member's load during the released time period.

## J. TUITION REMISSION

Full-time MBUs with six (6) months or more of continuous service may enroll, tuition-free, in any undergraduate or graduate course given on any permanent campus maintained and operated by RWU, excluding the RWU School of Law and provided that attendance at such courses does not conflict with the MBUs' formal working hours.

Full-time MBUs' spouses or any of their children, adopted children, or stepchildren, either through age 26 at the start of the semester in which enrolled, or legally dependent as qualified by IRS regulations and included on his/her parent's tax return, may also apply and, if accepted, enroll, tuition-free, in any undergraduate or graduate degree program as a matriculated student on any permanent campus maintained and operated by the University, excluding the RWU School of Law. The above identified individuals may also elect to enroll in individual courses on a tuition remission basis, in

addition to degree granting programs provided there is classroom space available. Tuition remission for graduate courses not taken as a matriculating student is limited to three in the graduate degree discipline.

If an MBU dies after an individual who is eligible under this section has been accepted and enrolled at the University under this section then the provisions of this section shall continue for five (5) years or until the individual graduates, whichever is sooner.

Acceptance into a course or degree program, as set out above, is contingent upon availability of classroom space, and also upon ability of the student to complete the course or program successfully. Cost of books, supplies, application fees, student athletic fees, student activity fees, health service fees, or other fees are payable by the student. The student is also responsible to reimburse the payment made by RWU to a supervising faculty member when a student enrolls in an independent study.

K. PART-TIME FACULTY MBUs

Adjunct teaching faculty in the day program shall be entitled to the following benefits, on a pro-rated basis:

1. Health Insurance (Article XIV, Subsection A.1.)
2. Dental Insurance (Article XIV, Subsection A.2.)
3. Life Insurance (Article XIV, A.6.)
4. Social Security (Article XIV, Section B)
5. Workers' Compensation (Article XIV, Section C)
6. Sick Leave (Article XIV, Subsection H.2.)
7. Discounts and Privileges (Article XIV, Section G).

This entitlement shall begin only after being employed for four (4) months. Once the four-month period has been served this provision will take effect. An MBU who is not continuously employed need not re-serve the four (4) months in the event he/she returns to the bargaining unit. All current part-time MBU s shall be exempt from this provision.

Part-time MBUs who fail to make timely payment of their pro-rata share of the cost of any benefits under this section will thereby forfeit their right to all benefits under this section for the duration of this Agreement.

## ARTICLE XV
## SEVERABILITY

## ARTICLE XV
## SEVERABILITY

Should any provisions of this Agreement be adjudged to be unlawful by a court of competent jurisdiction, such provision shall be treated for all purposes as null and void, but all other provisions of this Agreement shall continue to be in full force and effect, except as provided herein.

## ARTICLE XVI
## NON-WAIVER

Failure of either party to insist upon performance of the terms and conditions of this Agreement by the other in any one or more instances shall not be construed as a waiver or relinquishment of the rights of either party to expect and require future performance of any such terms and conditions by the other, and notwithstanding any such failure, the obligations of the parties and of faculty members covered by this Agreement to such future performance of its terms and conditions shall continue in force and effect.

## ARTICLE XVII
## NO STRIKE/NO LOCKOUT

The RWUFA agrees that during the term of this Agreement neither it nor any of its members will participate in any work stoppage at the University. RWU agrees it will not initiate any form of lock-out during the term of this Agreement. Both parties agree that all disputes arising during the effective dates of this Agreement will be settled in accordance with the grievance procedure.

## ARTICLE XVIII
## DURATION

This Agreement, together with its appendices (attached) entered into this date, shall, except as otherwise agreed and set out herein, take effect upon ratification and shall continue in full force and effect, except as otherwise noted, until June 30, 2008, when said Agreement and appendices shall terminate.

IN WITNESS WHEREOF the following have set their signatures and seals this 1st day of April, 2005.

For RWU

[signature]

Robert H. Avery, Esq.
Vice President & General Counsel

For RWUFA

James Tackach

James Tackach, Ph.D.
President and Professor

Edward J. Kavanagh, Ph.D.
Provost & Chief Academic Officer

Kim E. Greene, Esq.
Assistant General Counsel &
Director of Labor/Management Relations

Jeffrey B. Martin, Ph.D.
Associate Provost &
Bargaining Team Member

Mirlen A. Martinez, Esq.
Office Manager, Office of General
Counsel, Attorney & Bargaining Team
Member

Jeanette Woolley
Assistant Executive Director, NEARI

Richard Bernardi, Ph.D.
Treasurer & Professor

Romelyn Woodruff
Secretary & Professor

June Speakman, Ph.D.
Past President & Professor

Mel Topf, ~~Ph.D.~~
Committee Chair, Professor & President
Elect

Veronica Maher
Committee Chair & Professor

Lou Swiczewicz, Ph.D.
Professor and Bargaining Team Member

Kathleen Dunn, Ph.D.
Professor & Bargaining Team Member

Jeffrey Staats
Professor & Bargaining Team Member

## APPENDIX A
## FACULTY PROFESSIONAL ETHICS

Both the University and the RWUFA are committed to the highest levels of professionalism on the part of individual faculty members as teachers, scholars, and members of the University community and the larger communities in which they live and work. As professionals, individual faculty members comply with the ethical norms of the profession of teaching and refrain from unprofessional conduct that significantly impedes the mission and functioning of the University.

Faculty members understand the special professional responsibilities that they have to their students and others within the University community. The University and the RWUFA recognize those special responsibilities and have adopted as a part of the collective bargaining agreement, this appendix on Faculty Professional Ethics (Appendix A) derived from the A.A.U.P. Statement on Professional Ethics (originally adopted in 1966, and revised in 1987).

### THE STATEMENT

1. Professors guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

2. As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to ensure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

3. As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

4 As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to

criticize and seek revision. Professors give due regard to their paramount responsibilities within the institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

5. As members of the community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

**APPENDIX B**

ACADEMIC FREEDOM

Faith in the fundamental importance of freedom forms a major theme in the history, government and tradition of the State of Rhode Island and Providence Plantations and of the United States of America. Freedom is also recognized on practical grounds as vital to the scholar in his search for and dissemination of truth. Although academic freedom is not written into law, it is well established in custom and grounded in traditions of long standing in the colleges and universities of the Western World, protecting professional scholars and teachers from interference with their obligation to pursue the truth. Though it is a specific kind of freedom peculiar to members of the teaching profession in higher education, its benefits ultimately accrue as much to the public at large as to the scholars themselves. In fact, the present age of accelerating change emphasizes that education must stress development of the capacity for critical thought, a capacity that can be achieved only when freedom in inquiry and discussion prevail. Therefore, in accordance with the ideals of state and nation, and in order that the institutions under its jurisdiction might perform well the functions for which they are established, RWU and the RWUFA affirm their unqualified acceptance of the principle of freedom in inquiry and expression.

Academic freedom has been defined and codified in a statement of principles that was prepared by representatives of the American Association of University Professors and the Association of American Colleges. Adopted by both organizations in 1941 and later endorsed by many other professional and learned societies, it is known as "The 1940 Statement of Principles on Academic Freedom and Tenure." RWU unconditionally endorses the 1940 Statement, including the following pertinent passages:

"Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition.

Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspects is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.

The teacher is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his/her other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

The teacher is entitled to freedom in the classroom in discussing his/her subject, but he/she should be careful not to introduce into his/her teaching controversial matter which has no relation to his/her subject. Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.

The college or university teacher is a citizen, a member of a learned profession, and an officer of an education institution. When he/she speaks or writes as a citizen, he/she should be free from institutional censorship or discipline, but his/her special position in the community imposes special obligations. As a person of learning and an educational officer, he/she should

remember that the public may judge his/her profession and his/her institution by his/her utterances. Hence he/she should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he/she is not an institutional spokesperson.

The university/college faculty member is a citizen, and like other citizens, should be free to engage in political activities so far as he/she is able to do so consistent with his/her obligations as a faculty member."

# APPENDIX C

| Professors | | 2004-2005 | 2005-2006 | 2006-2007 | 2007-2008 |
|---|---|---|---|---|---|
| | Base Table: | (3.25%) + 1.00m | (3.5%) + 1.25m | (3.75%) + 1.25m | (4.0%) +1.25m |
| 1 | $ 50,520 | $ 52,162 | $ 53,988 | $ 56,012 | $ 58,253 |
| 2 | $ 53,050 | $ 54,774 | $ 56,691 | $ 58,817 | $ 61,170 |
| 3 | $ 55,580 | $ 57,386 | $ 59,395 | $ 61,622 | $ 64,087 |
| 4 | $ 58,110 | $ 59,999 | $ 62,099 | $ 64,427 | $ 67,004 |
| 5 | $ 60,640 | $ 62,611 | $ 64,802 | $ 67,232 | $ 69,922 |
| 6 | $ 63,170 | $ 65,223 | $ 67,506 | $ 70,037 | $ 72,839 |
| 7 | $ 65,700 | $ 67,835 | $ 70,209 | $ 72,842 | $ 75,756 |
| 8 | $ 68,230 | $ 70,447 | $ 72,913 | $ 75,647 | $ 78,673 |
| 9 | $ 70,760 | $ 73,060 | $ 75,617 | $ 78,452 | $ 81,591 |
| 10 | $ 73,290 | $ 75,672 | $ 78,320 | $ 81,257 | $ 84,508 |
| 11 | $ 75,820 | $ 78,284 | $ 81,024 | $ 84,062 | $ 87,425 |
| 12 | $ 78,350 | $ 80,896 | $ 83,728 | $85,465/ $86,868 | $88,883 / $90,342 |
| 13 | $ 80,880 | $ 83,509 | $ 86,432 | $86,868/ $89,673 | $90,342 / $93,260 |
| 14 | $ 82,145 | $ 84,815 | $ 87,783 | $88,271/ $91,075 | $91,801/ $94,718 |
| 15 | $ 83,410 | $ 86,121 | $ 89,135 | $89,674/ $92,478 | $93,260/ $96,177 |
| 16 | $ 84,675 | $ 87,427 | $ 90,487 | $91,077/ $93,880 | $94,719/ $97,635 |
| 17 | $ 85,940 | $ 88,733 | $ 91,839 | $92,480/ $95,283 | $96,178/ $99,094 |
| 18 | $ 87,205 | $ 90,039 | $ 93,191 | $93,883/ $96,685 | $97,637/ $100,553 |
| 19 | $ 88,470 | $ 91,345 | $ 94,542 | $95,286/ $98,088 | $99,096/ $102,012 |
| 20 | $ 89,735 | $ 92,651 | $ 95,894 | $96,689/ $99,490 | $100,555/ $103,470 |

Note: Step 12 and Step 13 in 2006-2007 is split. Those at Step 12 in 2005-2006 or at Step 13 in 2005-2006 receive the second or higher number as an indexed salary. Those at Step 11 or less in 2005-2006 move to Step 12 only upon the award of merit in 2006-2007 or thereafter and then receive the first or lower increment.

**APPENDIX C (cont'd)**

| Associate Professors | | 2004/05 | 2005/06 | 2006/07 | 2007/08 |
|---|---|---|---|---|---|
| | Base Table: | (3.0%) + 1.00m | (3.00%) + 1.25m | (3.00%) + 1.25m | (3.25%) +1.25m |
| 1 | $ 46,000 | $ 47,380 | $ 48,801 | $ 50,265 | $ 51,899 |
| 2 | $ 47,250 | $ 48,668 | $ 50,128 | $ 51,631 | $ 53,309 |
| 3 | $ 48,650 | $ 50,110 | $ 51,613 | $ 53,161 | $ 54,889 |
| 4 | $ 50,200 | $ 51,706 | $ 53,257 | $ 54,855 | $ 56,638 |
| 5 | $ 51,900 | $ 53,457 | $ 55,061 | $ 56,713 | $ 58,556 |
| 6 | $ 53,750 | $ 55,363 | $ 57,023 | $ 58,734 | $ 60,643 |
| 7 | $ 55,750 | $ 57,423 | $ 59,145 | $ 60,920 | $ 62,899 |
| 8 | $ 57,900 | $ 59,637 | $ 61,426 | $ 63,269 | $ 65,325 |
| 9 | $ 60,200 | $ 62,006 | $ 63,866 | $ 65,782 | $ 67,920 |
| 10 | $ 62,650 | $ 64,530 | $ 66,465 | $ 68,459 | $ 70,684 |
| 11 | $ 65,250 | $ 67,208 | $ 69,224 | $ 71,300 | $ 73,618 |
| 12 | $ 68,000 | $ 70,040 | $ 72,141 | $ 74,305 | $ 76,720 |
| 13 | $ 70,900 | $ 73,027 | $ 75,218 | $ 77,474 | $ 79,992 |
| 14 | $ 73,950 | $ 76,169 | $ 78,454 | $79,141/ $80,808 | $81,713/ $83,434 |
| 15 | $ 75,475 | $ 77,739 | $ 80,071 | $80,808/ $82,474 | $83,434/ $85,154 |
| 16 | $ 77,150 | $ 79,465 | $ 81,848 | $82,475/ $84,304 | $85,155/ $87,044 |
| 17 | $ 78,975 | $ 81,344 | $ 83,785 | $84,142/ $86,298 | $86,876/ $89,103 |
| 18 | $ 80,950 | $ 83,379 | $ 85,880 | $85,809/ $88,456 | $88,597/ $91,331 |
| 19 | $ 83,075 | $ 85,567 | $ 88,134 | $87,476/ $90,778 | $90,318/ $93,729 |
| 20 | $ 85,350 | $ 87,911 | $ 90,548 | $89,143/ $93,264 | $92,039/ $96,295 |

Note: Step 14 in 2006-2007 and 2007-2008 is split. Those at Step 14 in 2005-2006 receive the second or higher number as an indexed salary. Those at Step 13 or less in 2005-2006 move to Step 14 only upon the award of merit in 2006-2007 and thereafter and then receive the first or lower step increment.

**APPENDIX C (cont'd)**

| Assistant Professors | | 2004/05 | 2005/06 | 2006/07 | 2007/08 |
|---|---|---|---|---|---|
| | **Base Table:** | **(3.0%) + 1.00m** | **(3.0%) + 1.25m** | **(3.0%) + 1.25m** | **(3.0%) +1.25m** |
| 1 | $ 44,000 | $ 45,320 | $ 46,680 | $ 48,080 | $ 49,522 |
| 2 | $ 45,200 | $ 46,556 | $ 47,953 | $ 49,391 | $ 50,873 |
| 3 | $ 46,500 | $ 47,895 | $ 49,332 | $ 50,812 | $ 52,336 |
| 4 | $ 47,900 | $ 49,337 | $ 50,817 | $ 52,342 | $ 53,912 |
| 5 | $ 49,400 | $ 50,882 | $ 52,408 | $ 53,981 | $ 55,600 |
| 6 | $ 51,000 | $ 52,530 | $ 54,106 | $ 55,729 | $ 57,401 |
| 7 | $ 52,700 | $ 54,281 | $ 55,909 | $ 57,587 | $ 59,314 |
| 8 | $ 54,500 | $ 56,135 | $ 57,819 | $ 59,554 | $ 61,340 |
| 9 | $ 56,400 | $ 58,092 | $ 59,835 | $ 61,630 | $ 63,479 |
| 10 | $ 58,400 | $ 60,152 | $ 61,957 | $ 63,815 | $ 65,730 |
| 11 | $ 60,500 | $ 62,315 | $ 64,184 | $ 66,110 | $ 68,093 |
| 12 | $ 62,700 | $ 64,581 | $ 66,518 | $ 68,514 | $ 70,569 |
| 13 | $ 65,000 | $ 66,950 | $ 68,959 | $ 71,027 | $71,863/ $73,158 |
| 14 | $ 67,400 | $ 69,422 | $ 71,505 | $72,338/ $73,650 | $74,508/ $75,860 |
| 15 | $ 69,900 | $ 71,997 | $ 74,157 | $73,649/ $76,381 | $75,858/ $78,672 |
| 16 | $ 71,150 | $ 73,285 | $ 75,483 | $74,960/ $77,748 | $77,209/ $80,080 |
| 17 | $ 72,500 | $ 74,675 | $ 76,915 | $76,271/ $79,223 | $ 78,559/ $81,599 |
| 18 | $ 73,950 | $ 76,169 | $ 78,454 | $77,582/ $80,807 | $79,909/ $83,231 |
| 19 | $ 75,500 | $ 77,765 | $ 80,098 | $78,893/ $82,501 | $81,260/ $84,976 |
| 20 | $ 77,150 | $ 79,465 | $ 81,848 | $80,204/ $84,304 | $82,610/ $86,833 |

Note: Step 14 in 2006-2007 is split and Step 13 in 2007-2008 is split. Those at Step 14 in 2005-2006 receive the second or higher number as an indexed salary in 2006-2007. Those at Step 13 or less in 2005-2006 move to Step 14 only upon the award of merit in 2006-2007 or thereafter and then receive the first or lower increment. Those at Step 13 in 2006-2007 receive the second or higher number as an indexed salary in 2007-2008. Those at Step 12 or less in 2006-2007, thereafter move to Step 13 only upon the award of merit in 2007-2008 or thereafter and then receive the first or lower step increment.

## APPENDIX D

1. The Collective Bargaining Agreement entered into this date does not apply to the Roger Williams University Ralph R. Papitto School of Law, which is not a party to this Agreement, nor shall said Agreement be deemed applicable to any faculty members or any other employees of the Roger Williams University Ralph R. Papitto School of Law. It is also understood and agreed that neither faculty nor other employees employed by the Roger Williams University Ralph R. Papitto School of Law shall constitute an accretion to the bargaining unit represented by the Association.

2. It is also understood and agreed that the tuition remission provisions of the aforesaid Collective Bargaining Agreement shall not be applicable to courses offered by the Roger Williams University Ralph R. Papitto School of Law.

3. The University agrees that during the term of the Collective Bargaining Agreement, no programs or courses offered by the University will be transferred to the Roger Williams University School of Law.

# APPENDIX E
# UNIVERSITY CALENDARS

2004-2008 University Calendars, in their entirety, will be provided by RWU and RWUFA via electronic means. Advising and Registration dates are currently be worked on to finalize internal administrative processes.

**APPENDIX F**

MERIT REPORT GUIDELINES

Annual Report of Faculty Activity for Consideration of Merit Awards

The criteria for Merit Awards are defined in the contract as follows:

"The evaluation criteria are teaching excellence, scholarship in or related to the discipline for which the faculty member is employed, applied or bench research of significance, and/or distinguished professional service."

Awards for merit are based on exceptional and exemplary performance in one or more of the evaluation areas.

Merit Awards may be added to base pay in recognition of ongoing contributions or granted as one time bonus awards, not added to base pay, in recognition of one time achievements.

Timelines

Each faculty member seeking a merit award shall complete the relevant sections of this form, provide evidence and documentation as indicated, and submit it to his/her dean or, in departmentalized schools, department chair, by February 10. The report should cover only activities during the previous calendar year. However, these activities may reference the cumulative effect of an ongoing body of work or achievement. The Dean/chair will forward the reports to the Merit Review Committee of that school or division.

[*The Fall semester will be the season for peer review for promotion, tenure and reappointment decisions. The Spring semester will be the season for peer input on merit pay.*]

The Merit Review Committee will forward their recommendations to the Dean of their school by March 10.

The Deans will forward their recommendations to the Provost by April 1.

Merit awards will be announced by May 1 and will take effect at the beginning of the next fiscal year. (For example, on February 15, 2005 a faculty member would report the activities in Winter Intersession 2004, Spring 2004, Summer 2004, and Fall 2004. If a merit award was granted, it would take effect on July 1, 2005).

A. General Application and Overview

Describe the area or areas of your activities you believe deserve recognition.
Have you received compensation for this (these) activities?

1. previous merit award
2. other monetary compensation
3. course release(s)

Describe, in a thoughtful way, your activities during the previous year that you consider worthy of merit. Explain why. It is important to connect your accomplishments and goals to your discipline and/or to the strategic plan of the department, the college/school, and the University.

The following categories outline some of the possible areas and documentation you might submit. You are only expected to discuss those categories that are appropriate to your application. In whatever categories you choose to discuss, you should include:

1. a list of activities
2. a discussion of why they deserve a Merit Award
3. documentation

Note: You are encouraged to submit relevant material in support of your application.

B: <u>Teaching Activities:</u>

| Area | Evidence: |
| --- | --- |
| Courses taught | Student evaluations of each regular course taught |
| | Self-evaluative statement for each course taught |
| | Peer evaluation of teaching |
| | Supervisor evaluation of teaching (if available) |
| Seminars conducted at RWU | Notice of seminar/lecture |
| Independent studies | Description of independent study projects |
| Curricular development | New or revised course syllabi, materials, etc. |
| Graduate student supervision | List of graduate students supervised |
| Undergraduate and/or graduate thesis supervision | List of students and thesis topics supervised |
| Graduate Comprehensive Exams | Exams read/corrected |

C. <u>Scholarship</u>

| | |
|---|---|
| Publications | Copies of publications |
| Acceptances | Copy of letter of acceptance |
| Submissions | Copy of letter of submission |
| Creative Projects/Performances | Documention/Reviews |
| Technical reports | Copy of final/published report |
| Book reviews | Copy of published reviews |
| Grant proposals | Signed copy of grant proposal form |
| Active/Funded grants | Documentation from the Grants Office |
| Conference presentations | Copy of program |
| Keynote presentations | Copy of program/letter of invitation |
| Invited presentations | Copy of program/invitation |
| Editorial reviews | List of journals or publishers, as well as specific projects or manuscripts reviewed |
| External PTR reviews | Letter of invitation |

D: <u>Departmental Activities and Advising</u>

Statement of these activities, including explanation for why the activities should be deemed outstanding.

E: <u>Service to the University</u>

| | |
|---|---|
| Membership on Committees, including explanation for why the activities should be deemed outstanding. | Letter from Chair |

F: <u>Professional Service to the Community</u>

| | |
|---|---|
| Statement of activities, including explanation for why the activities should be deemed outstanding. | Letter from group, newspaper, articles, etc. |

| | | |
|---|---|---|
| G: | Service to the Profession | |
| | Statement of activities for professional and scholarly organizations, including explanation for why the activities should be deemed outstanding. | Letter from relevant group or organization |
| H: | Professional Honors and Awards | |
| | Description of honor/award | Copy of letter of notification |
| I: | Other Relevant Activities | |

## APPENDIX G
## SELF STUDY GUIDELINES

I. Comprehensive Self Study Reviews

COVER SHEET

This will be provided by the office of the respective Dean and will include name, rank, and status (post-tenure faculty, faculty applying for promotion, sixth-, fourth- and second-year probationary review). Faculty submitting a self-study are required to complete all sections.

SECTION I: INSTRUCTION

1. Describe your educational philosophy as it applies across your teaching.

2. Provide a list of courses taught according to the following schedule:
   a. Post-tenure faculty and faculty seeking promotion should discuss four courses that the faculty member and the respective dean have agreed upon.
   b. 2-, 4-, and 6-year probationary faculty should discuss all of the courses taught during the previous academic year.

3. Describe the goals and/or objectives for each course being considered, and, wherever possible, discuss how they relate to the goals and objectives of the academic program, the school/college, and the Mission of the University.

4. Describe the following components for each course providing a rationale for each in terms of the objectives of the course:
   a. organization of the course
   b. method of delivery
   c. assignments/activities
   d. examinations or other assessment tools

5. Describe student performance in each course and assess the performance in terms of the goals and objectives of the course. This should include but not be limited to an analysis of the student course surveys. Whenever possible, provide additional evidence that these goals and objectives have been met.

SECTION II: ACADEMIC ADVISING AND PROGRAM DEVELOPMENT

1. Describe your approach to academic advising and analyze its effectiveness.

2. Describe your activities in program development and assess you contributions.

SECTION III: SCHOLARSHIP AND PROFESSIONAL DEVELOPMENT

1. List publications and conference presentations documenting your research grant or academic fundraising activities (applications, awards, maintenance) and/or creative activities since the last self-study and indicate how these activities have enhanced your teaching and other work at RWU.

2. Describe other professional development activities undertaken since the last self-study and indicate how those activities have enhanced your teaching and other work at RWU.

3. Provide a statement of your research interests and agenda. (Faculty members are referred to two seminal works on the range of scholarship possibilities: Ernest L. Boyer, *Scholarship Reconsidered* (Princeton: Carnegie Foundation, 1990) and Charles E. Glassick, Mary Taylor Huber, and Gene I. Maeroff, *Scholarship Assessed* (San Francisco: Jossey Bass, 1997).

SECTION IV: SERVICE TO THE UNIVERSITY AND COMMUNITY

Other than program development discussed above, describe your service to

a. your department/program
b. your school/college
c. the university
d. the community

SECTION V: GOALS

1. List the professional goals you set out in the last self-study

2. Describe the extent to which you have met those goals.

3. Describe how you have met the recommendations/concerns outlined by the Dean and Chief Academic Officer in your last comprehensive review.

4. Describe your short and long term professional goals for the future.

SECTION VI: SUPPORTING MATERIAL

1. Provide a copy of the syllabus of each course being considered.

2. Provide copies of relevant materials that you prepared for use in your courses (representative samples of assignments, examinations, etc)

3. Provide a current copy of your curriculum vita.

4. Provide copies of research material, professional publications, grant material, or documentation of creative activities produced since your last evaluation. Include evidence of peer review.

5. Provide copies of data summaries of student course surveys for courses taught during the last year.

6. Provide copies of the comprehensive reviews by the Dean and Chief Academic Officer:

For Probationary and Tenure submissions: for the entire probationary period (up to six years)

For Post Tenure and Promotion submissions: the most recent review

7. Include any other materials that support your self-study

II. Limited Self-Study Guidelines
(for 1st Year Probationary and Visiting Faculty)

COVER SHEET

This will be provided by the office of the respective Dean and will include name, rank, and status (1st year probationary or visiting faculty, 2nd year visiting faculty).

First year probationary and visiting faculty in their first and second year are required to complete only Section I and parts 1, 2, 3, and 5 of Section VI of the Comprehensive Review outlined above with the exception to I,1 that first year probationary and visiting faculty should discuss only the courses taught during their first semester at RWU.

In their second year review, visiting faculty should, additionally, discuss courses taught in the 2nd semester of their 1st year.

**APPENDIX H**

MISCELLANEOUS

1. ARTICLE V, RIGHTS OF INDIVIDUALS, provision F. INTELLECTUAL PROPERTY shall remain intact pending the conclusion of a joint RWU and RWUFA appointed special committee charged as the "Joint Intellectual Property Advisory Committee" (Committee I) to study, analyze, discuss and recommend an "Intellectual Property Policy and Procedure" as successor provision to current provision F.

   The Committee I will consist of three individuals, one selected by RWU, one selected by the RWUFA, and one selected by the two appointed as set out herein. Should the parties fail to select the third member of the Committee I, each will appoint a member and the Committee I will be constituted as four individuals.

   The Committee I is charged to make formal written recommendation to RWU and RWUFA for a successor provision F. within one year of the date of ratification of this Agreement. Failing recommendation within this timeline, the Committee I will disband unless otherwise mutually agreed by RWU and RWUFA. Failing accepted recommendation for successor provision by both RWU and RWUFA, current provision F. will remain unchanged for the duration of this Agreement.

2. Associate Professors Edward J. Delaney and Philip C. Marshall shall, upon completing their respective fifteen years of continuous faculty service to the University, be promoted effective the beginning of the following academic year. The compensation accompanying the promotions shall be in accordance with ARTICLE XIII, COMPENSATION, of the successor Agreement. These promotions may not be used as either indicia of achievement or lack thereof.

3. A modified severance plan with discreet and now expired periods of operation will be forwarded to a joint RWU and RWUFA appointed special committee charged as the "RETIREMENT INCENTIVE PROGRAM COMMITTEE" (Committee II) to study, analyze, discuss, develop and make recommendations concerning a potential successor "modified severance plan" within nine (9) months from the date of ratification of this Agreement. Until such time as recommendations are made and adoption of any successor plan is enacted, there will be no formal retirement incentive program, however, RWU will entertain all individual proposals to the Chief Academic Officer for an incentive buyout on a case-by-case basis.

   Committee II will consist of the General Counsel and Vice President for Human Resources, one additional representative selected by RWU and two representatives selected by the RWUFA.

4. The terms of the 2001-2004 collective bargaining agreement remain and remained in effect until ratification of the 2004-2008 collective bargaining agreement (this Agreement).

5. A special committee charged as the "Domestic Partners Benefits Review Committee" (Committee III) will be formed within thirty (30) days following

ratification of this Agreement for the specific purpose of studying, discussing, analyzing, developing and recommending a prudent, financially reasonable course of action, relative to policy development and implementation concerning Domestic Partner Benefits at the University. The recommendation, unless an extension is mutually agreed upon by the parties hereto, is due on or before the passage of one year from formation of Committee III.

Committee III will consist of four individuals, two selected by RWU and two selected by RWUFA. At the conclusion of Committee III's work or one year, whichever is earlier, a formal written report will be forwarded to the parties hereto for adoption or rejection. A minority (or second) report may be issued if there is no consensus on a final report and affiliated recommendations. Absent adoption of the report and its recommendations, the matter will be subject to a sixty (60) day negotiating period to find mutually beneficial resolution. Failing positive resolution there will be no change to current benefits relative to "Domestic Partners".

6. A special committee charged as the "Online & Distance Education Policy and Procedure Committee" (Committee IV) will be formed within thirty (30) days following ratification of this Agreement for the specific purpose of studying, discussing, analyzing, developing, and recommending a new and governing "Online & Distance Education Policy & Procedure". The Committee IV will report with recommendation to the parties within one year of formation of the Committee. In the interim, the parties will be left to their respective rights concerning the development and administration of online and distance education and faculty participation will be voluntary.

7. The special committee heretofore charged with studying and making cogent recommendations for positive amendments to the current Student Course Surveys program is re-commissioned to continue its evaluation of the program and present recommendations for further improvement within one year of the date of ratification of this Agreement.

8. In fiscal year 2005/06 (Year #2 of the Agreement), twenty-thousand dollars ($20,000) will be set aside in escrow from the merit pool for Year #2 and in fiscal year 2006/07 (Year #3 of the Agreement), forty-thousand dollars ($40,000) will be set aside in escrow from the merit pool for Year #3 for designation in step increments to base salary in each of those years, respectively, to faculty members compensated at a salary step less than former longevity Step #9 prior to the beginning of this successor Agreement's compensation program implementation and who, in the sole judgment of RWUFA suffered a reduction in compensation when comparing the expired longevity compensation matrix and the successor compensation structure. These escrowed funds will be deducted from the Schools/Divisions 75% allocation of the merit pool as defined in ARTICLE XIII.A.3, Merit Compensation Program. Assignment by RWUFA will not occur until after implementation of the merit program awards in each year of the two years of this special escrow and assignment agreement.

RWUFA will provide RWU a detailed list of recipients and the available Step increments assigned from the funds within thirty (30) days of publication to the RWUFA of final merit awarding and recipients. All escrowed funds not formally designated by the RWUFA for individual assignment, consistent with the foregoing, shall become available for merit distribution in accordance with merit program parameters. RWUFA will not file or support any grievance or charge against RWU arising out of the administration of this assignment of funds to the RWUFA for designation as it deems appropriate and in full satisfaction of the foregoing rationale for special salary assignment.

9. Professors David Melchar, Elizabeth Learned and Ferd Schroth shall be granted tuition reimbursement under their current degree programs for an additional two (2) academic years (2004/05 & 2005/06) as needed.

10. Nancy Hood shall continue her current status as a part-time psychological counselor, relative to compensation, benefits, and workload, including prorated adjustments consistent with this Agreement.

11. Non-contractual Side Letters located at pages 65 and 66, 72 and 73, 74 and 75 of the expired 2001-2004 collective bargaining agreement are deleted in their entirety and of no further effect. All provisions of said "Letters" that have been retained, either directly or in modified format, have been inserted as text in this Agreement to which this APPENDIX is incorporated. APPENDIX C, FACULTY PARKING REGUALTIONS, of the expired 2001-2004 collective bargaining agreement has been moved to text of this Agreement to which this APPENDIX is incorporated. Memoranda of Agreement located on pages 67,68, 69, 70 and 71 of the expired 2001-2004 collective bargaining agreement are deleted and of no further effect, except and only as exist in text of this Agreement and/or its Appendices.

12. Following formal ratification and prior to distribution of this Agreement, an "Editing Committee" will perform a review of this Agreement to edit conflicting provisions from those set out by "Tentative Agreement".